J-A22005-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| ESTATE OF JOHN B. MATTHEWS, VIRGINIA MATTHEWS, KRISTIE STEINMETZ, AND LISA MARCONI | : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : | |
| MWA ACQUISITIONS, LLC | : : | No. 1440 WDA 2021 |
| Appellant | : | |

Appeal from the Order Entered November 4, 2021
In the Court of Common Pleas of Beaver County Civil Division at No(s):
A.D. 11230-2018

BEFORE:  OLSON, J., DUBOW, J., and COLINS, J.[*]

MEMORANDUM BY OLSON, J.:             **FILED: DECEMBER 16, 2022**

Appellant, MWA Acquisitions, LLC, appeals from the November 4, 2021 order granting summary judgment in favor of the Estate of John B. Matthews, Virginia Matthews, Kristie Steinmetz, and Lisa Marconi (collectively, "Matthews") and denying summary judgment in favor of Appellant.  We vacate the November 4, 2021 order and remand this case for further proceedings in accordance with this memorandum.

The record demonstrates that during 2009, and January 2010, Appellant and Matthews engaged in negotiations whereby Appellant sought to acquire the assets of a wall anchor services business owned by Matthews, including, *inter alia*, the business's tangible and intangible property.  These negotiations

_____

[*] Retired Senior Judge assigned to the Superior Court.

culminated in the execution of an asset purchase agreement ("APA"). The APA, pursuant to the language set forth in the "In Witness Whereof" line, was entered into on January 4, 2010. The agreed upon purchase price for Matthews' business was $1,365,000.00.[1] The APA included a breakdown of the purchase price between tangible and intangible assets, as well as services.[2] The APA contemplated that Appellant would make payment as follows: (1) $238,500.00 in previously tendered earnest money;[3] (2) payment of a promissory note in the amount of $75,000.00 for consulting services with a maturity date of January 29, 2017; (3) payment of a promissory note in the

_____

[1] The written description of the purchase price was "One Million Four Hundred Fifty Thousand and 00/100 Dollars," which differed from the numeric representation of the purchase price. Nevertheless, the parties agree that the purchase price was $1,365,000.00. The allocation of the purchase price between tangible and intangible assets, as well as services, confirms a purchase price of $1,365,000.00 because the sum of the allocated amounts is $1,365,000.00, as discussed *infra*.

[2] Generally, an allocation of tangible and intangible assets, as well as services, will be set forth in an asset purchase agreement to ensure, *inter alia*, that all parties report the same information on tax forms and documents filed with the state and federal governments as a result of the sale. Here, the APA allocated the purchase price as follows: $475,000.00 to goodwill (an intangible asset subject to amortization); $740,000.00 to inventory and equipment (tangible assets subject to depreciation); $75,000.00 to a non-compete agreement payable in the form of a promissory note (an intangible asset subject to amortization); and $75,000.00 for consulting services (an expense) payable in the form of a promissory note.

[3] The check representing payment of the earnest money was dated February 10, 2008, which suggests that the negotiations may have begun as early as February 2008.

amount of $75,000.00 as compensation for a non-compete agreement with a maturity date of January 29, 2017; and (4) the remaining balance due at the time of closing payable in "immediately available funds."[4]

Assets transferred pursuant to the APA as part of the business would be conveyed "clear and free of any and all liens, charges[,] and encumbrances as of the Closing." Asset Purchase Agreement, 1/4/10, at § 2.3. Section 7.6 of the APA, captioned "Entire Agreement", stated,

> This Agreement constitutes the entire agreement between the parties and supersedes all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof. Notwithstanding the foregoing, this Agreement is to be entered into in conjunction and shall be construed with that certain Bill of Sale [("BOS")], Purchase and Sale Agreement [("PSA"),[5]] Consulting Agreement[,] and Non-Compete Agreement entered into by and between the parties, each agreement being dated as of the Closing.

Asset Purchase Agreement, 1/4/10, at § 7.6.

_____

[4] Section 1.3 of the APA specifies that, at closing, the final sum due from Appellant to Matthews totaled $1,126,450.00. This final payment figure, when coupled with the earnest money amount of $238,550.00, equaled the purchase price of $1,365,000.00 without taking into consideration that a portion of the payment was made through Appellant's obligation to pay $150,000.00 pursuant to two promissory notes, as described *supra*. A review of the settlement statement prepared at the closing on January 29, 2010, demonstrates that $150,000.00 was included as a portion of the payment of the total purchase price. The amount tendered by Appellant to Matthews at closing was, in fact, $744,541.24.

[5] The PSA, executed on January 4, 2010, was an agreement in which Appellant agreed to purchase and Matthews agreed to sell certain land and premises located in Beaver Falls, Pennsylvania, as more fully described in the PSA.

At the closing on January 29, 2010, settlement statements were produced showing the final amounts Appellant would pay Matthews pursuant to the APA and PSA. On that same date, the parties also executed two "stand still promissory notes" each in the amount of $75,000.00 plus interest and having a maturity date of January 29, 2017. A BOS was also executed, although it is unclear whether the document was executed on January 29, 2010, because the day and month provisions were left blank. Based upon the recitals contained in the BOS, which include, *inter alia*, the transfer of title from Matthews to Appellant for Matthews' business assets and tangible and intangible property, we assume that the BOS was executed on January 29, 2010, the date of closing.

The parties also executed an Indemnification Agreement ("IA") which stated that the document was executed "as of the day and year first above written." The IA preamble, however, does not contain a date. Both parties agree that the IA was executed on January 29, 2010. **See** Appellant's Brief at 13; **see also** Matthews' Brief at 17. This January 29, 2010 date of execution is further supported by the IA preamble clause that states, "WHEREAS, [Appellant] and [Matthews] **have entered** into an [APA] for the purchase of [Matthews'] business assets[,]" indicating that the IA was executed at some point after the execution of the APA on January 4, 2010.

On September 21, 2018, Matthews filed a complaint asserting claims of breach of contract and unjust enrichment based upon Appellant's "fail[ure] to satisfy its debts and obligations under the [Promissory] Notes and the [APA]."

Matthews' Complaint, 9/21/18, at ¶¶14-27. On October 15, 2018, Appellant filed an answer, new matter, and a counterclaim asserting, *inter alia*, a claim of breach of contract based upon Matthews' failure "to indemnify and hold [Appellant] harmless" under the terms of the IA for all warranty claims paid by Appellant for work performed by Matthews prior to Appellant's acquisition of Matthews' business. Appellant's Answer, New Matter, and Counterclaim, 9/21/18, at ¶¶32-38. Matthews filed a reply to Appellant's answer, new matter, and counterclaim on November 2, 2018, asserting as "new matter" that the IA, upon which Appellant's counterclaim was based, is "not a valid agreement" and "is unenforceable" because the contemplated terms set forth in the IA are precluded by the integration clause in Section 7.6 of the APA. Matthews' Reply, 11/2/18, at 9-10. Appellant replied to Matthews' new matter on November 21, 2018.

On August 13, 2021, Appellant filed a motion for summary judgment. Matthews filed a cross-motion for summary judgment on August 16, 2021. The trial court entertained argument by the parties on their respective motions for summary judgment on September 15, 2021. On November 4, 2021, the trial court granted summary judgment in favor of Matthews and denied Appellant's motion for summary judgment. On November 18, 2021, Appellant filed a motion for reconsideration, which the trial court subsequently denied on November 22, 2021. This appeal followed.[6]

---

[6] Both Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant raises the following issues for our review:

[1.] Whether the trial court erred in determining that the [IA] was unenforceable, superseded, [or] otherwise could not be considered because of the integration clause contained in the January 4, 2010 [APA?]

[2.] Whether the trial court erred in determining that the [IA] was created or entered into prior to or contemporaneously with the January 4, 2010 [APA?]

[3.] Whether the trial court erred in its application of the parol evidence rule because: (a) the [IA] is not parol evidence; (b) the rule does not bar consideration of subsequent agreements; (c) the rule only applies to prohibit the consideration of prior oral representations or agreements that concern a subject which is specifically dealt with in the subsequent written contract; and (d) the rule does not prevent parties from memorializing an agreement *via* multiple written documents[?]

[4.] Whether, because the [IA] is a valid contract enforceable by its terms, [Appellant] is allowed to set off the costs it [] incurred in connection with warranty claims arising from warranties extended [or] work performed by [Matthews] against the Promissory Notes that are the subject of [Matthews'] complaint, and therefore, no payment is due[?]

[5.] Whether, in the alternative, the trial court should have denied all parties' motions for summary judgment because the [APA] and the [IA] are ambiguous and there are genuine issues of material fact respecting the meaning of the aforementioned agreements and the parties' intentions in connection with the same[?]

Appellant's Brief at 4 (extraneous capitalization omitted).

Appellant's issues, *in toto*, challenge the trial court's order granting summary judgment in favor of Matthews. Our standard and scope of review of an order granting summary judgment is well-settled.

- 6 -

A reviewing court may disturb the order of the trial court only where it is established that the [trial] court committed an error of law or abused its discretion. As with all questions of law, our review is plenary.

In evaluating the trial court's decision to enter summary judgment, we focus on the legal standard articulated in the summary judgment rule. [*See*] Pa.R.C[iv].P. 1035.2. [Rule 1035.2] states that where there is no genuine issue of material fact and the moving party is entitled to relief as a matter of law, summary judgment may be entered. Where the non-moving party bears the burden of proof on an issue, he may not merely rely on his pleadings or answers in order to survive summary judgment. Failure of a non-moving party to adduce sufficient evidence on an issue essential to his case and on which it bears the burden of proof establishes the entitlement of the moving party to judgment as a matter of law. Lastly, we will view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party.

*Murphy v. Duquesne Univ. of The Holy Ghost*, 777 A.2d 418, 429 (Pa. 2001) (case citations, ellipses, and quotation marks omitted).

Appellant's first four issues collectively challenge the trial court's determination that the parol evidence rule precluded consideration of the IA as part of the APA because, as the trial court found, the IA was entered into prior to or contemporaneously with the formation of the APA. Appellant's Brief at 10-24. Appellant contends that the parol evidence rule does not apply to the instant case because (1) "the parties clearly intended that [Appellant's] purchase of the [business assets] would be governed by multiple documents, including the APA and the [IA, with] each such agreement being read together[;]" (2) the IA was not agreed upon prior to or contemporaneously with the formation of the APA but, rather, was "executed and effective on

January 29, 2010, twenty-five days **after** the APA[;]" and (3) the APA is silent as to Appellant's right to set off warranty claims paid against the amounts due under the Promissory Notes. *Id.* at 19-20.

"A contract is formed when the parties to it 1) reach a mutual understanding, 2) exchange consideration, and 3) delineate the terms of their bargain with sufficient clarity." *Company Image Knitware, Ltd. v. Mothers Work, Inc.*, 909 A.2d 324, 330 (Pa. Super. 2006) (citation and original quotation marks omitted), *appeal denied*, 929 A.2d 645 (Pa. 2007). "Because contract interpretation is a question of law, our review of the trial court's decision is *de novo* and our scope of review is plenary." *Gaffer Ins. v. Discover Reinsurance Co.*, 936 A.2d 1109, 1112-1113 (Pa. Super. 2007).

"For a contract to be enforceable, the nature and extent of the mutual obligations must be certain, and the parties must have agreed on the material and necessary details of their bargain." *Lackner v. Glosser*, 892 A.2d 21, 30 (Pa. Super. 2006).

> The fundamental rule in construing a contract is to ascertain and give effect to the intention of the parties.
>
>> In order to determine the meaning of the agreement, we must examine the entire contract since it is well[-]settled that in construing a contract the intention of the parties governs and that intention must be ascertained from the entire instrument taking into consideration the surrounding circumstances, the situation of the parties when the contract was made and the objects they apparently had in view[,] and the nature of the subject matter.
>
> Where several instruments are made as part of one transaction they will be read together, and each will be construed with reference to the other[. T]his is so although the instruments may

have been executed at different times and do not in terms refer to each other.

***Huegel v. Mifflin Constr. Co., Inc.***, 796 A.2d 350, 354 (Pa. Super. 2002); *see also **Neville v. Scott***, 127 A.2d 755, 757 (Pa. Super. 1956) (noting, "'Nor is there any requirement that a contract be evidenced by a single instrument. If contracting parties choose, they may express their agreement in one or more writings and, in such circumstances, the several documents are to be interpreted together, each one contributing (to the extent of its worth) to the ascertainment of the true intent of the parties."); ***Fizzano Bros. Concrete Prods., Inc. v. XLN, Inc.***, 42 A.3d 951, 968-969 (Pa. 2012) (stating, "transactional realities sometimes require a scrutiny that extends the focus beyond the confines of the immediate consequences of the proximal asset purchase agreement").

In explaining the parol evidence rule, our Supreme Court has stated,

> Where the parties, without any fraud or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only, evidence of their agreement. All preliminary negotiations, conversations[,] and verbal agreements are merged in and superseded by the subsequent written contract and unless fraud, accident[,] or mistake be averred, the writing constitutes the agreement between the parties, and its terms and agreements cannot be added to nor subtracted from by parol evidence.

***Yocca v. Pittsburgh Steelers Sports, Inc.***, 854 A.2d 425, 436 (Pa. 2004) (ellipsis omitted), *citing **Gianni v. Russell & Co.***, 126 A. 791 (Pa. 1924). For the parol evidence rule to apply, the writing must represent the entire contract between parties. ***Yocca***, 854 A.2d at 436 (citation omitted).

To determine whether or not a writing is the parties' entire contract, the writing must be looked at and if it appears to be a contract complete within itself, couched in such terms as import a complete legal obligation without any uncertainty as to the object or extent of the parties' engagement, it is conclusively presumed that the writing represents the whole engagement of the parties. An integration clause which states that a writing is meant to represent the parties' entire agreement is also a clear sign that the writing is meant to be just that and thereby expresses all of the parties' negotiations, conversations, and agreements made prior to its execution.

*Id.* (citation, quotation marks, ellipsis, and brackets omitted).  Nonetheless,

[t]he presence of an integration clause cannot invest a writing with any greater sanctity than the writing merits where[] it assertedly does not fully express the essential elements of the parties' undertakings.

Nor is there any requirement that a contract be evidenced by a single instrument.  If contracting parties choose, they may express their agreement in one or more writings and, in such circumstances, the several documents are to be interpreted together, each one contributing (to the extent of its worth) to the ascertainment of the true intent of the parties.  And, where it can be shown by competent evidence that no single writing embodied or was intended to embody the whole of the parties' understanding, the parol evidence rule has no application.

*Int'l Milling Co. v. Hachmeister, Inc.*, 110 A.2d 186, 191 (Pa. 1955).

Here, the trial court, in granting summary judgment in favor of

Matthews, stated,

the [trial] court finds the agreements to be unambiguous, making the intent of the parties easily discernable within the four corners of those agreements.[7]  In this instance, the presence of the

---

[7] The trial court intended for the term "agreements" to represent collectively the APA, BOS, PSA, consulting agreement, and non-compete agreement. **See** Trial Court Opinion, 11/4/21, at 2.

integration clauses makes the parol evidence rule applicable[, t]hereby preventing [Appellant from] modify[ing] or amend[ing] the terms of the agreements with prior or contemporaneous agreements. Although the IA is undated, it expressly states that it operates in relation to the sale of the business' assets, "which shall occur on January 29, 2010." Further, [Appellant] states within its responses to interrogatories that the IA "was signed on or about January 29, 2010." [Appellant's] own assertion, along with the express language of the IA, allow the [trial] court to determine that the IA was created prior to the agreements or contemporaneously with the agreements. Therefore, the [trial] court finds that the IA cannot operate in conjunction with the agreements.

Trial Court Opinion, 11/4/21, at 7-8 (record citations and extraneous capitalization omitted). The trial court further explained,

the [trial] court found the agreements to represent the parties' entire contract and thus, it deemed application of the [parol evidence] rule to be necessary. The crux of [Appellant's] issue turns on when the agreements were effectively entered into. [Appellant] makes the argument that since the APA was dated on January 4, 2010[,] that should constitute the effective date of the agreements and[,] therefore, the parol evidence rule cannot be used to bar admission of the January 29, 2010 IA. The [trial] court disagrees. [This Court, in *Crew Levick Co. v. Philadelphia Inv. Bldg. & Loan Ass'n*, 177 A. 498 (Pa. Super. 1935),] held that a contract whereby a mortgagee assumes indebtedness in consideration of conveyance of property does not become effective until the date of the conveyance of the property. Therefore, even if the contract was drawn or dated several days, weeks, or months prior, it will not go into effect until the property is conveyed and all parol arrangements antedating the conveyance would be inadmissible to vary terms of the contract. Although the APA was perhaps drawn on January 4, 2010, it did not become effective until the date of the conveyance of the property [contemplated by] the agreements. Therefore, any parol agreements made prior to or contemporaneous[ly] with that date of conveyance, which were not included within the integration clause, could not be used to vary, modify, or supplant the terms of the agreements. Both the PSA and the APA list the closing as on or before January 31, 2010. Further, the [BOS] states that the transfer of assets is to occur on the closing date. Therefore, the

- 11 -

[trial] court finds the January 29, 2010 IA to be a prior or contemporaneous agreement and cannot be used to modify the agreements' terms.

Trial Court Opinion, 1/26/22, at 3-4 (record citations and extraneous capitalization omitted).

We are mindful that, in simplest terms, a binding agreement of sale, such as an asset purchase agreement, must include a description of the interest in the property being conveyed, the names of the purchaser and the seller, the purchase price to be paid by the purchaser or the manner of determining it, the manner in which the purchase price is to be paid, the time and place of the closing, and an obligation on the seller to convey marketable title to the property being conveyed. Thus, the APA in the case *sub judice* became a binding agreement upon its execution on January 4, 2010. Thereupon Appellant and Matthews became obligated to undertake certain endeavors, and incurred certain liabilities, to perfect the intent of the APA, which ultimately included the sale of Matthews' business assets to Appellant. Although executed on January 4, 2010, the culmination of the agreement's intent, that is the transfer of title to Matthews' business assets, was not effective until the closing. It was on the closing date that Appellant agreed, *inter alia*, to execute the Promissory Notes and tender payment for the balance of the purchase price due and Matthews agreed, *inter alia*, to transfer good and clear title of all business assets to Appellant. To that end, we concur with the trial court that the effective date of the APA, that is to say the date Appellant was obligated to pay and, in return, receive good and clear title to

the assets and Matthews was obligated to transfer title, was not until the closing when all obligations called for under the APA had been perfected. Nonetheless, this distinction between the execution date and the effective date is of little consequence to the issue presented herein because the APA was not intended from its onset to be the full, and complete written agreement memorizing this business transaction.[8]

It is clear from a plain reading of the APA, and in particular the integration clause of the agreement, that the parties did not intend the transaction to be memorized by a single, written document but, rather, intended that the transaction be memorialized through a series of written instruments, including the BOS and the Promissory Notes.[9] *See Neville*, 127 A.2d at 757 (stating, parties may choose to express their full agreement in a series of writings to be interpreted together); *see also Giant Foods Stores, LLC v. THF Silver Spring Dev., L.P.*, 959 A.2d 438, 447 (Pa. Super. 2008) (holding that, "although the four written instruments [] may have been executed at different times and do not in terms refer to each other, [the four documents] constitute one transaction" and must "be read together and each

_____

[8] Because the APA does not represent the entire contract between the parties, we do not find the parol evidence rule applicable. *Yocca*, 854 A.2d at 436 (holding that, for the parol evidence rule to apply, the writing must represent the entire contract between parties).

[9] While the certified record contains copies of the two Promissory Notes, it is devoid of evidence that a consulting agreement or a non-compete agreement, as called for under the Section 7.6 integration clause of the APA, were executed.

construed with reference to the other" without applicability of the parol evidence rule), *appeal denied*, 972 A.2d 522 (Pa. 2009). While the integration clause lists several of the written documents that were to be executed as part of this business transaction, this list was not exhaustive. For example, if the documents referenced within the integration clause were a complete list, the settlement statement, which was not referenced in the integration clause but was prepared as part of the closing, would bear no significance to the completion of the asset purchase transaction. The practice of "closing" a business transaction, such as the asset purchase contemplated in the case *sub judice*, regularly involves a settlement statement, as the settlement statement determines, or details, the final amount of the purchase price due from the purchaser at the time of closing. If the APA were representative of the entire agreement, Appellant would have been obligated to tender $1,126,450.00, the amount called for in Section 1.3(d) of the APA, at the closing. However, the settlement statement demonstrates that Appellant was required to tender only $744,541.24 at closing, a fact the parties do not dispute. Thus, these two documents, the APA and the settlement statement, were to be read in conjunction with each other as part of a single transaction despite the fact that the settlement statement was not referenced in the integration clause.

To complete this asset purchase transaction, the APA also contained a requirement that Matthews transfer the business assets free and clear of any liens, charges, and encumbrances, which would include any warranty defect

claims asserted by third parties against Appellant but pertained to work performed by Matthews prior to the closing date. The APA is silent as to how Matthews would discharge the obligation to transfer the business assets free and clear of such claims. The IA, however, explains how the parties sought to ensure that the assets of Matthews' business would be transferred at the time of closing free and clear of all claims, including warranty defect claims.[10] The IA accomplished this task by permitting Appellant to set off any claims against the Promissory Note obligations. Specifically, the IA states that,

> WHEREAS, as a condition of the [APA,] the assets are to be free and clear of liabilities[,] claims[,] and liens[.]
>
> NOW THEREFORE IN CONSIDERATION of such representations and warranties and in consideration of the purchase of the [b]usiness with the interest to be legally bound[,] the parties hereto agree as follows:
>
> . . .
>
> The parties hereto hereby agree that should any claim be made against [Appellant] that [Appellant] shall be able to set off any such claims against monies owed pursuant to the two [] $75,000.00 [Promissory] Notes between [Appellant and Matthews].

Thus, similar to the settlement statement, the IA, although not referenced in the integration clause as a document encompassed within the APA, is by its nature a document contemplated by the parties as pertaining to this overall

---

[10] The APA, BOS, PSA, and Promissory Notes (copies of the consulting agreement, and non-compete agreement are not part of the certified record) also do not address how Matthews would discharge his obligation to transfer the business assets free and clear of all claims at the time of closing.

- 15 -

asset purchase transaction. ***See Neville***, 127 A.2d at 757 (stating, the integration clause is not controlling when the agreement in which it is found does not "fully express the essential elements of the parties' undertakings"). The IA was intended to be the document forming a part of the overall transaction that explained how Matthews was to transfer the business assets free and clear of any claims, namely that Appellant could set off any claim against its Promissory Note obligations.

Upon review of the record, we discern that because the IA was one of several written documents that formed a part of the overall transaction to purchase Matthews' business assets, the trial court erred in finding that consideration of its terms was prohibited by the parol evidence rule. The IA permitted Appellant to set off warranty defect claims against the money due under the terms of the Promissory Notes. As such, the trial court erred as a matter of law in denying Appellant's motion for summary judgment. Therefore, we vacate the trial court's November 4, 2021 order granting summary judgment in favor of Matthews and denying the same to Appellant. This case is remanded so the trial court may enter an order granting summary judgment in favor of Appellant and denying Matthews' motion for summary judgment.[11]

---

[11] As of August 13, 2021, the date on which Appellant filed its motion for summary judgment, Appellant paid warranty defect claims in excess of $500,000.00. Matthews does not dispute the amount paid for warranty defect claims but, rather, disputes that Appellant is entitled, pursuant to the IA, to

Order vacated.  Case remanded.  Jurisdiction relinquished.[12]

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/16/2022

---

set off the money due under the Promissory Notes by this amount.  In view of our determination, Appellant is entitled to reduce its payment obligations under the Promissory Notes by the amounts paid for warranty defect claims.

[12] In light of our disposition herein, Appellant's fifth issue is moot.